IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMANDA A. UNGER,<br><br>    Plaintiff<br><br>v.<br><br>CAROLYN W. COLVIN<br>Acting Comm'r of Soc. Sec.,<br><br>    Defendant | :<br>:<br>:<br>:  Civil No. 1:13-CV-02028<br>:<br>:<br>:<br>:<br>:  Judge Sylvia H. Rambo<br>:<br>: |

# **M E M O R A N D U M**

Presently before the court is Plaintiff's appeal of a final decision by the Social Security Commissioner denying Plaintiff's claim for Disability Insurance Benefits under Title II of the Social Security Act. Plaintiff contends that the administrative decision, concluding that she has not been disabled since August 1, 2010, is not supported by substantial evidence and contains errors of law. For the following reasons, the court will affirm the decision of the Commissioner.

**I.**     **Background**

    **A.**     **Procedural History**

On September 2, 2010, Plaintiff, Amanda A. Unger, protectively filed for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (Doc. 11-6, p. 2 of 53.) In her application for DIB, Plaintiff claimed that she had been disabled since April 1, 2009.[1] (*Id.*) The Social Security Administration initially denied Plaintiff's claim (Doc. 11-3, p. 2 of 3), and on March 23, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Doc. 11-4, pp. 17-18 of 75).

---

[1] Plaintiff later amended the onset date of her alleged disability from April 1, 2009 to August 1, 2010.

A hearing was held before ALJ Randy Riley on April 26, 2012, during which both Plaintiff and Michael Kibler, a vocational expert, provided testimony. (Doc 11-2, pp. 27-29 of 47.) ALJ Riley denied Plaintiff's claim, finding that Plaintiff was not entitled to DIB (*Id.* at p. 10 of 47), and on May 31, 2012, Plaintiff filed an appeal with the Appeals Council (*Id.* at p. 9 of 47). The Appeals Council denied review on July 1, 2013, leaving the ALJ's decision as the final decision of the Social Security Commissioner. (*Id.* at p. 2 of 47.) Consequently, Plaintiff commenced the instant action in this court on July 29, 2013. (Doc. 1.)

### B. **Plaintiff's General Background**

At the time of the hearing, Plaintiff was 50 years old and resided with her husband, Terry Unger ("Mr. Unger"), a disabled veteran. (Doc. 11-2, p. 31 of 47.) Plaintiff could read and write in English, graduated high school, and had one year of post-secondary education. (*Id.*) Her work history includes substitute teaching, working as a stock clerk, and breeding dogs. (*Id.* at p. 43 of 47.) More recently, Plaintiff had worked as a job development specialist assisting mentally and physically challenged adults. (*Id.*)

### C. **Medical Records**

The gravamen of Plaintiff's instant action is the ALJ's assessment of her psychological impairments. (*See* Doc. 12, pp. 12-21 of 22.) Nevertheless, because the record contains evidence that Plaintiff suffered from both physical and psychological impairments, the court will briefly address Plaintiff's physical conditions before focusing on the psychological conditions.

### 1. **Physical Impairments**

Plaintiff's physical impairments are related to her back and knees. (*See* Doc. 11-8, p. 51 of 100; Doc 13, pp. 11-12 of 28.) On July 15, 2013, Plaintiff claimed that she experienced back pain when she reached for objects. (Doc. 11-8, p. 51 of 100.) X-rays of Plaintiff's back revealed mild degenerative changes to her spine. (*Id.* at p. 39 of 100.)

Plaintiff has also complained of intermittent bilateral knee pain, beginning in 2008. (*See id.* at p. 26 of 100; Doc. 11-9, p. 5 of 37.) X-rays revealed meniscus damage, arthritis, and a chronic anterior cruciate ligament (ACL) injury of Plaintiff's left knee and similar damage to Plaintiff's right knee. (Doc. 11-8, pp. 19, 23 of 100.) On December 17, 2008, Plaintiff underwent chondroplasty surgery on her left knee. (*Id.* at p. 26 of 100.) The surgery appeared to resolve Plaintiff's left knee pain, and on January 31, 2012, Plaintiff reported that her medication provided good relief from her joint pain and that her right knee no longer periodically bothered her. (*See* Doc. 11-9, p. 5 of 37.) On April 26, 2012, however, Plaintiff complained that her knees would start to swell when she stood for more than 20 minutes. (Doc. 11-2, p. 40 of 47.)

### 2. **Psychological Impairments**

Plaintiff has sought medical care for numerous psychological impairments, including post-traumatic stress disorder (PTSD) from watching her first husband commit suicide, psychosis with depression, generalized anxiety disorder, and panic disorder with agoraphobia. (*See* Doc. 11-7, p. 31 of 101; Doc. 11-8, p. 75 of 100.) While seeking treatment, Plaintiff has reported that she suffers from hallucinations and sees images of bugs crawling over and under her skin, a woman in

her backyard, and her deceased first husband after he shot himself in the head. (Doc. 11-7, p. 31 of 101; Doc. 11-8, p. 95 of 100.) Plaintiff has received medical care for these impairments from the Veterans Administration ("VA"), as the spouse of a disabled veteran. (*See* Doc. 11-7, p. 84 of 101.) Holly R. Kricher, Psy.D., a licensed psychologist, and Victoria M. Acker, PA-C, have been Plaintiff's primary care providers. (*See id.* at pp. 18-94 of 101.)

The VA first became involved with Plaintiff's care on January 8, 2010. (*See id.* at p. 18 of 101.) At this time, Plaintiff received a psychological consult and a PTSD screening. (*Id.*) The screening was negative. (*Id.*) On March 3, 2010, PA-C Acker diagnosed Plaintiff with generalized anxiety disorder and panic disorder, as well as alcohol dependence in early remission. (*Id.* at p. 5 of 28.) PA-C Acker assessed Plaintiff's global assessment of functioning (GAF) at 60, indicating some moderate symptoms. (*Id.* at p. 5 of 28.)

Prior to September 2010, Plaintiff reported that her treatment regimen was working well. (*See id.* at pp. 31-34 of 101.) On September 28, 2012, however, Plaintiff complained that her psychological impairments had worsened and that she had developed hallucinations. (*Id.*) PA-C Acker assessed Plaintiff's GAF at 40 and provided Plaintiff with a referral for therapy to deal with unresolved grief issues regarding her first husband's suicide. (*Id.*) After reporting that she was not improving, Plaintiff's medications were adjusted on November 3, 2010. (*Id.* at pp. 27-28 of 101.)

On December 1, 2010, Plaintiff began treatment with Dr. Kricher. (Doc. 11-8, pp. 53-54 of 100.) Plaintiff told Dr. Kricher that she was hallucinating images of her deceased husband's body after he had shot himself in their bedroom.

(*Id.*) Dr. Kricher diagnosed Plaintiff with PTSD. (*Id.*) After complaining that her hallucinations had worsened, Plaintiff was diagnosed with psychosis on December 15, 2010. (*Id.* at p. 92 of 100.) Plaintiff was informed, however, that her condition may not have improved because of her failure to take her medications as instructed. (*Id.* at p. 91 of 100.)

On January 31, 2011, PA-C Acker again adjusted Plaintiff's medications, believing Plaintiff's symptoms were not indicative of a true psychosis. (*Id.* at pp. 71-72 of 100.) PA-C Acker noted that Plaintiff complained of contradictory symptoms, such as stating that she felt calmer overall but later claiming that she suffered from three to four panic attacks per day. (*Id.*) Plaintiff also told PA-C Acker that she knew her hallucinations were not real but later stated that she did not understand why her husband could not see what she sees. (*Id.*) On July 21, 2011, PA-C Acker re-assessed Plaintiff's psychological condition and characterized Plaintiff's hallucinations as "unusual" because the hallucinations occurred in all three spheres and lasted throughout the entire day. (*Id.* at pp. 46-47 of 100.)

On October 28, 2011, Plaintiff had a therapy session with Dr. Kricher. (Doc. 11-9, pp. 19-20 of 37.) Plaintiff again reported contradictory information. (*Id.*) Plaintiff told Dr. Kricher that she had not left her home since her last appointment in June of 2011, but Plaintiff had attended several appointments with other medical care providers during that time. (*Id.*) During the therapy session, Plaintiff also stated that she was uninterested in pursuing more intensive therapy. (*Id.*)

On November 14, 2011, Dr. Kricher completed a medical source statement, reporting that Plaintiff's psychological impairments caused marked and extreme limitations in all mental demands except for understanding and recalling short, simple instructions and making simple work-related decisions. (Doc. 11-8, pp. 99-100 of 100.) However, on November 16, 2011, only two days later, Plaintiff told PA-C Acker that she was feeling better and no longer hallucinated images of bugs crawling on her skin. (Doc. 11-9, pp. 11-12 of 37.) Plaintiff also re-emphasized that she was not interested in therapy. (*Id.*) Plaintiff's disinterest in therapy was again asserted on April 13, 2012, when Plaintiff refused inpatient treatment and an emergency room assessment. (*Id.* at p. 27 of 37.)

### D. **Hearing Testimony**

Plaintiff testified that she suffers from anxiety and panic attacks. (Doc. 11-2, pp. 36-39 of 47.) According to Plaintiff, the anxiety and panic attacks began in 2008 or 2009. (*Id.* at p. 36 of 47.) While prescription medication initially controlled Plaintiff's symptoms, the "medications . . . stopped helping." (*Id.*) Plaintiff further testified that she quit her job because the uncontrolled panic attacks prevented her from driving:

> Q: Why could you not drive?
>
> A: Because I thought I was going to die.
>
> Q: . . . [W]hat were you experiencing that made you feel like you were going to die?
>
> A: I was afraid I was going to get into an accident and die and kill the people that were in my car with me.
>
> Q: It was because of the panic attacks or something else?
>
> A: I guess because of the panic attacks.

(*Id.*)  Plaintiff admitted that, other than not feeling safe driving, the panic attacks did not interfere with her ability to do her job.  (*Id.*)  Plaintiff likewise denied having "any other problems at all" at the time.  (*Id.* at p. 37 of 47.)

Plaintiff further testified that at some point her panic attacks worsened, but she could not recall when they worsened.  (*Id.* at p. 38 of 47.)  Instead, Plaintiff "guess[ed]" that around six or seven months prior to the hearing, she started having more anxiety and could no longer stay focused long enough to read or perform household activities.  (*Id.*)  Plaintiff recounted an instance where she suffered a panic attack from attempting to go to the grocery store but also testified that she attends doctor appointments.  (*Id.* at p. 39 of 47.)  When describing her hallucinations, Plaintiff stated that she sees images of her deceased first husband and of bugs crawling on her skin and appeared at the hearing with an open wound on one of her arms, apparently self-inflicted:

> Q: Do you ever scratch yourself when you see the bugs?
> A: Yes.  Because I try to get them out.
> Q: Is that – your arm is open now, is that from the –
> A: Yes.  Because I try to get them out.  I use tweezers and I try to get them out when I see them.

(*Id.* at p. 38 of 47.)  Plaintiff described a typical day for herself as caring for her two dogs and two cats, attempting to start household activities such as laundry, then looking out the window for the remainder of the day after she is unable to focus long enough to complete the initiated activities.  (*Id.* at pp. 33-35 of 47.)  Finally, Plaintiff testified that her husband routinely performs all household activities, including laundry, vacuuming, taking out the trash, cooking, doing the dishes, and maintaining the yard.  (*Id.* at pp. 32-33 of 47.)

7

After Plaintiff finished testifying, the ALJ posed the following hypothetical to Michael Kibler, a vocational expert:

> Assume a person of the claimant's age, education[,] and work experience that's able to do the following: light work; no foot control operations; work limited to simple, routine[,] and repetitive tasks; no interaction with the public. Can they do . . . [any] types of jobs?

(*Id.* at p. 43 of 47.)  Based on the hypothetical, Mr. Kibler opined that an individual having the same limitations as Plaintiff could perform work as an assembler of small products and as an egg candler.  (*Id.* at p. 44 of 47.)  Mr. Kibler provided the following testimony regarding the availability of these occupations:

> [A]ssembler, small products, DOT number 739.687-030, classified light physical demands, an SVP: 2 or unskilled. In the national economy there are approximately 230,000; in the state economy approximately 2,500 and locally approximately 500 . . . [E]gg candler . . . DOT number 529.687-074, which is classified light physical demands, with an SVP: 2, unskilled.  In the national economy there are approximately 40,000; in the state economy approximately 1,800 and locally approximately 200.

(*Id.*)  Mr. Kibler further opined that under the same hypothetical but with several additional factors considered: "[a] sit/stand option at will; occasional interaction with coworkers but no tandem tasks; [and] occasional supervision," the hypothetical individual could still perform work as an assembler of small products and additionally could work as a bakery worker.  (*Id.* at pp. 44-45 of 47.)  Mr. Kibler provided the following testimony regarding the availability of bakery worker positions:

> [B]akery worker, conveyor line, DOT number 524.687-022, which is classified as light physical demands, with an

> SVP: 2 or unskilled. In the national economy there are approximately 85,000; in the state economy approximately 4,500 and locally approximately 200.

(*Id.* at p. 45 of 47.)

Thus, based on these hypotheticals, Mr. Kibler suggested that jobs suitable for Plaintiff's limitations as posed by the ALJ exist in the regional economy. The ALJ did, however, pose a third and final hypothetical to Mr. Kibler, further expanding the hypothetical limitations. (*See id.* at p. 45 of 47.) Under this hypothetical, Mr. Kibler was told to consider an individual who is unable to engage in "sustained work activity on a regular and continuing basis for eight hours a day, five days a week[,] for a 40[-]hour work week." (*Id.*) In response to this hypothetical, Mr. Kibler opined that such an individual would be unemployable. (*Id.*)

## II.      Standard of Review

A district court's review of a Commissioner's decision is limited. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). A district court has plenary power over the Commissioner's *legal* conclusions but is bound by the Commissioner's *factual* findings if the findings are supported by substantial evidence. *See id.*; *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008). Substantial evidence is "more than a mere scintilla. It [is] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brownawell*, 554 F.3d at 355. A single piece of evidence may not constitute substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). When determining whether substantial evidence exists, a court is not

permitted to "re-weigh the evidence or impose [its] own factual determinations." *Chandler*, 667 F.3d at 359.

### III. Discussion

#### A. Administrative Framework

Under the Social Security Act, claimants are considered disabled only if their "physical or mental impairments . . . are of such severity that [they are] not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). In making this determination, an ALJ follows a five-step sequential analysis. *Id.* The ALJ reviews:

> (1) the claimant's current work activity; (2) the medical severity and duration of the claimant's impairments; (3) whether the claimant's impairments meet or equal the requirements of an impairment listed in the regulations; (4) whether the claimant has the residual functional capacity [RFC] to return to past relevant work; and (5) if the claimant cannot return to past relevant work, whether [they] can make an adjustment to other work in the national economy.

*Id.* (internal quotation marks omitted). In this sequential analysis, the claimant bears the burden of proof during steps one through four, but the Commissioner bears the burden of proof during step five. *Id.*

#### B. ALJ's Decision

Following the sequential analysis, the ALJ concluded at step two that Plaintiff had "the following severe impairments: obesity, anxiety, psychosis NOS, panic with agoraphobia[,] and osteoarthritis of the left knee." (Doc. 11-2, p. 15 of 47.) The ALJ also noted, *inter alia*, Plaintiff's mild degenerative changes to her back and joints but found that these impairments were not severe. (*Id.*) The ALJ

10

failed to name, however, Plaintiff's PTSD as a severe impairment and did not indicate that he had considered Plaintiff's PTSD to be only minor in nature. (*See id.*)

Prior to step four of the sequential analysis, the ALJ assessed Plaintiff's RFC. (*See id.* at p. 17 of 47.) When determining Plaintiff's RFC, the ALJ considered the following:[2] Plaintiff's testimony regarding her psychological and physical symptoms, statements made by her husband,[3] the opinion of a state-employed psychological consultant obtained January 25, 2011, Dr. Kricher's medical opinion, and the opinion of a non-examining state agency medical consultant obtained January 24, 2011. (*See id.* at pp. 17-20 of 47.) Regarding the psychological symptoms, the ALJ stated that he considered, *inter alia*, Plaintiff's panic attacks, irrational fears, mood swings, fear of going outside and being around people, hallucinations, and difficulty doing the following: preparing meals, housecleaning, concentrating, understanding, getting along with others, and handling stress. (*See id.* at p. 18 of 47.) The ALJ also stated that he considered Plaintiff's physical impairments, including, *inter alia*, the swelling in her knees, joint pain, and the muscle spasms in her back. (*Id.*)

The ALJ stated that in addition to Plaintiff's statements, he considered the statements and opinions of others when determining Plaintiff's RFC. (*See id.* at pp. 17-20 of 47.) Specifically, the ALJ stated that he considered statements made by

---

[2] This list of considerations is not exclusive. Instead, only the considerations that Plaintiff contests are listed.

[3] On April 12, 2012, Mr. Unger wrote a five-page report that included a description of Plaintiff's physical and psychological symptoms, how these symptoms have prevented Plaintiff from performing household activities, and his extensive involvement in all household activities. (*See* Doc. 11-2, p. 24 of 47.) This report was entered as an exhibit at Plaintiff's hearing. (*Id.*)

Mr. Unger describing Plaintiff's fear of driving, panic attacks, hallucinations, lack of focus, and appearance of restlessness. (*See id.* at p. 18, 20 of 47.) The ALJ also considered the opinions of two state-employed consultants: one made by a non-examining medical consultant obtained January 24, 2011, and the other made by a psychological consultant on January 25, 2011. (*See id.* at p. 19 of 47.) The ALJ stated, however, that he accorded the latter opinion little weight because the consultant had opined that Plaintiff had no medically determinable mental health impairments, which is not supported by subsequent evidence obtained after January of 2011. (*Id.*)

Finally, the ALJ considered Dr. Kricher's medical opinion when determining Plaintiff's RFC. (*See id.* at pp. 19-20 of 47.) In Dr. Kricher's medical source statement, Dr. Kricher opined that Plaintiff suffered marked and extreme psychological limitations. (*Id.*) In Dr. Kricher's opinion, Plaintiff is only capable of following short, simple instructions and making simple work-related decisions. (*Id.*) The ALJ decided, however, to accord Dr. Kricher's opinion little weight, reasoning that the opinion appeared to be based on Plaintiff's subjective complaints instead of clinical findings. (*Id.*) The ALJ further reasoned that Plaintiff's psychological "restrictions [were] overstated in comparison to the treatment notes [and] that while [Plaintiff] complains of visual hallucinations, she is not interested in engaging in more intensive treatment, and seems to be at her baseline of functioning." (*Id.*) The ALJ noted that Plaintiff appeared for her doctor appointments appropriately dressed, pleasant, cooperative, maintaining good eye contact, and in no acute distress. (*Id.*) Furthermore, the ALJ reasoned that Plaintiff had required only "limited treatment, which is inconsistent with . . . marked [and] extreme limitations." (*Id.*)

After all of the above considerations, the ALJ concluded that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the Plaintiff maintained the RFC to "perform light work . . . [with] no foot control operations[,] . . . simple, routine, and repetitive tasks [but not tandem tasks][,] no interaction with the public, sit/stand option at will[,] occasional interaction with co-workers, [and] occasional supervision." (*See id.* at pp. 17-18 of 47.) Finally, the ALJ concluded that Plaintiff's and Mr. Unger's statements were "not credible to the extent they are inconsistent with the . . . [RFC] assessment." (*See id.* at p. 18 of 47.)

### C. **Plaintiff's Arguments**

Plaintiff raises three arguments in support of her appeal. (Doc. 12, p. 11 of 22.) Specifically, Plaintiff contends that the ALJ: (1) failed to acknowledge all medically determinable impairments established by the record; (2) improperly evaluated Plaintiff's credibility; and (3) improperly determined Plaintiff's RFC. The court will address each of these contentions in turn. (*Id.*)

#### 1. **Medically Determinable Impairments**

Plaintiff contends that the ALJ failed to acknowledge all medically determinable impairments established by the record. (*Id.*) Specifically, Plaintiff contends that the ALJ failed to acknowledge her PTSD and that this failure "undermines the ALJ's findings at steps two and four of the . . . sequential [analysis], as well as the ALJ's credibility finding." (*Id.* at p. 13 of 22.) At step two in the sequential analysis, an ALJ determines whether any severe impairments exist. *Weitzel v. Colvin*, No. 3:12-CV-220, 2013 WL 4510308, at *7 (M.D. Pa. Aug. 23, 2013). Step two is a threshold test. *Id.* If no severe impairments exist, the analysis

ends and the plaintiff is not entitled to DIB. *Id.* Alternatively, if at least one severe impairment exists, the analysis continues. *Id.* A failure to find a medical condition severe at step two, however, will not render a decision defective if some other medical condition was found severe. *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

In the instant case, the ALJ determined that Plaintiff suffers from multiple severe impairments, including obesity, anxiety, psychosis, panic with agoraphobia, and osteoarthritis of the left knee. Because the ALJ found that severe impairments exist, no reversible error occurred at this step. The court will address how the ALJ's failure to name Plaintiff's PTSD as a medically determinable impairment affects the ALJ's credibility assessment and RFC determination below.

### 2. **Plaintiff's Credibility**

Plaintiff also contends that the ALJ improperly evaluated her credibility. (Doc. 12, p. 11 of 22.) Specifically, Plaintiff contends that the ALJ: (1) failed to name Plaintiff's PTSD as a medically determinable impairment which undermined his evaluation of Plaintiff's credibility; (2) improperly evaluated Mr. Unger's statements and did not treat fairly his involvement in household activities; and (3) failed to acknowledge evidence that supported Plaintiff's case. (*Id.* at pp. 19-21 of 22.) Pursuant to regulations promulgated by the Commissioner, "[a]llegations of . . . subjective symptoms must be supported by objective medical evidence." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). After an ALJ concludes that a medical impairment could reasonably cause the alleged symptoms, the ALJ must "evaluate the intensity and persistence of [each] . . . symptom, and the extent to which [the symptom] affects the individual's ability to work." *Id.* This evaluation necessarily

includes determining the credibility of the plaintiff and whether the plaintiff is accurately stating his or her limitations, although the ALJ is not required to accept the plaintiff's claims as true. *Jenkins v. Astrue*, 836 F.Supp.2d 211, 225 (M.D. Pa. 2011). Once an ALJ has made a credibility determination, that determination is given great weight and deference because of the ALJ's duty of observing a witness's demeanor. *Id.*

In the instant case, the ALJ appropriately considered Plaintiff's psychological symptoms and their limiting effect on Plaintiff. Failing to name Plaintiff's PTSD as a medically determinable impairment did not affect the ALJ's credibility determination. Plaintiff argues that "failure to acknowledge a medically determinable impairment . . . undermines the ALJ's evaluation of the credibility of a [plaintiff's] symptoms because an ALJ cannot appreciate symptoms an impairment causes if the ALJ does not recognize the impairment exists." (Doc. 12, p. 14 of 22.) The ALJ did not dispute, however, that Plaintiff suffered from the psychological symptoms she claimed to experience, including, *inter alia*, panic attacks, irrational fears, mood swings, fear of going outside and being around people, and hallucinations. Indeed, Plaintiff fails to name any symptom of her PTSD that the ALJ doubted Plaintiff experienced. What the ALJ found not credible was the extent Plaintiff claimed her psychological symptoms limited her. The ALJ noted that, despite her severe impairments, Plaintiff was routine and conservatively treated, disinterested in further treatment and therapy, and able to appear in public while appropriately dressed, pleasant, cooperative, maintaining good eye contact, and in no acute distress. Specifically naming PTSD in addition to Plaintiff's acknowledged severe psychological impairments, namely anxiety and psychosis, would not have

changed the ALJ's finding that Plaintiff's statements regarding the extent of her limitations did not correlate with objective evidence.

Furthermore, the ALJ did not improperly evaluate Mr. Unger's statements or treat unfairly his involvement in household activities. Plaintiff contends that the ALJ "dismissed" Mr. Unger's statements from his consideration based solely on his personal belief that Mr. Unger was not credible. (Doc. 12, p. 20 of 22.) The court is unable to determine why Plaintiff believes the ALJ completely dismissed Mr. Unger's statements from his consideration. The ALJ stated that he found Mr. Unger's statements "less persuasive" than other evidence because "the record as a whole does not support the degree of limitation reported." (Doc. 11-2, p. 20 of 47.) Furthermore, the ALJ stated that Mr. Unger's statements were only not credible "to the extent they are inconsistent" with the RFC assessment. (*Id.* at p. 18 of 47.)

Finally, the ALJ did not fail to acknowledge evidence that supported Plaintiff's case. To the contrary, the ALJ acknowledged that Plaintiff required psychological treatment, including prescription medications, to control her psychological impairments. Additionally, the ALJ rejected certain evidence that contradicted Plaintiff's claims. For example, the ALJ rejected the opinion of a state-employed psychological consultant, obtained January 25, 2011, that stated that Plaintiff did not suffer from a medically determinable mental health impairment. While Plaintiff argues the ALJ failed to acknowledge an open wound on Plaintiff's arm that was visible during the hearing, the ALJ did not dispute that Plaintiff suffers from hallucinations of images of bugs crawling on her skin. Furthermore, while an ALJ must "give some indication of the evidence which he rejects and his reason(s)

for discounting such evidence," an ALJ is not required to discuss every piece of evidence in the record. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 (3d Cir. 2008).

In conclusion, the ALJ appropriately considered Plaintiff's psychological symptoms and their limiting effects, did not improperly evaluate Mr. Unger's statements or his involvement in household activities, and did not fail to acknowledge evidence that supported Plaintiff's case. The ALJ's credibility determination, therefore, was not improperly considered and is supported by substantial evidence. Consequently, this court accords the ALJ's credibility determination great weight and deference.

### 3. **Plaintiff's RFC**

Finally, Plaintiff contends that the ALJ improperly determined her RFC. (Doc. 12, p. 11 of 22.) Specifically, Plaintiff contends that the ALJ: (1) failed to consider her PTSD; (2) inappropriately considered the opinion of a state-employed psychological consultant; (3) improperly discredited Dr. Kricher's opinion in favor of his own judgment; and (4) improperly accorded great weight to an opinion by a non-examining state agency medical consultant. (*Id.* at pp. 15-19 of 22.) The determination of a plaintiff's RFC is the exclusive responsibility of the ALJ. *Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 163 (3d Cir. 2008). In making an RFC determination, the ALJ considers "the combined effect of all [a plaintiff's] impairments." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000).

In the instant case, the ALJ properly considered the combined effect of Plaintiff's psychological impairments. The ALJ acknowledged that Plaintiff suffers from panic attacks, irrational fears, mood swings, fear of going outside and being

around people, and hallucinations. As previously stated, Plaintiff fails to name any symptom of her PTSD that the ALJ failed to consider.

Furthermore, the ALJ did not inappropriately consider the opinion of a state-employed psychological consultant, obtained on January 25, 2011. Plaintiff contends, *inter alia*, that the consultant never received Plaintiff's medical records from after January 2011. (Doc. 12, p. 17 of 22.) Plaintiff further contends that the consultant did not assess Plaintiff's ability to work after September 2009, and Plaintiff, during the hearing, amended the onset date of her disability from April 1, 2009 to August 1, 2010, making the consultant's opinion irrelevant. (*Id.*) Plaintiff fails to acknowledge, however, that the ALJ specifically stated that he accorded the consultant's opinion "little weight" because, "[a]lthough [the] opinion was generally supported by the evidence at the time that it was rendered, subsequent evidence" had rendered it moot. (Doc. 11-2, p. 19 of 47.) Therefore, the ALJ did not inappropriately consider the consultant's opinion.

The ALJ also did not improperly discredit Dr. Kricher's opinion in favor of his own judgment. Plaintiff contends that the ALJ improperly discredited Dr. Kircher's November 2011 medical source statement. (Doc. 12, p. 17 of 22.) The ALJ stated that he accorded Dr. Kircher's opinion "little weight" because "it appear[ed] that [it was] based upon [Plaintiff's] subjective complaints rather than true clinical findings." (Doc. 11-2, pp. 19-20 of 47.) In this regard, Dr. Kircher opined that Plaintiff suffers from marked and extreme limitations from her psychological symptoms. (*Id.*) Other medical evidence had shown, however, that Plaintiff was only routinely and conservatively treated, was disinterested in further treatment and therapy, and was capable of appearing in public in no acute distress.

(*Id.*) The ALJ concluded, therefore, that Dr. Kricher's opinion was unsupported by the record as a whole. (*Id.*) While an opinion of a treating physician is normally accorded great weight, an ALJ "may reject a treating physician's opinion outright . . . on the basis of contradictory medical evidence." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). The ALJ justifiably rejected the unsupported opinion and did not improperly discredit Dr. Kricher's position.

Finally, the ALJ did not improperly credit the non-examining state agency medical consultant's January 24, 2011 opinion. Plaintiff contends that the consultant only assessed Plaintiff's ability to work through September 2009 and that the opinion therefore is unable to constitute substantial evidence. (Doc. 11-2, pp. 18-19 of 47.) Regarding this opinion, the ALJ noted that it "demonstrate[d] that [Plaintiff's] right knee pain is superficial and that surgery addressed and corrected [Plaintiff's] left knee pain." (Doc. 11-2, pp. 19 of 47.) The ALJ accorded the opinion great weight because the opinion was consistent with the record as a whole. (*Id.*) Plaintiff fails to state what has changed since September 2009 that renders the opinion incorrect. Furthermore, the consultant's opinion is not the only piece of evidence the ALJ considered in support of his decision. Therefore, the ALJ's RFC determination was not improperly determined and is supported by substantial evidence.

**IV.     Conclusion**

Based on the foregoing reasons and after a thorough review of the administrative record, the court concludes that the Commissioner's decision denying Plaintiff's claim for DIB is supported by substantial evidence. The court will therefore affirm the decision of the Commissioner.

An appropriate order will issue.

Dated: March 27, 2014.

<u>S/SYLVIA H. RAMBO</u>
United States District Judge